UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| TARA OSBORN, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 22-cv-1049 |
| ) | |
| JAB MANAGEMENT SERVICES, INC., ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION

Defendant JAB Management Services, Inc. ("JAB Management") terminated Plaintiff Tara Osborn's ("Osborn") employment in August 2021. Osborn claims JAB Management fired her after being an exemplary employee for twelve years because of her age in violation of the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-101, *et seq*., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*. (D. 14). She also alleges JAB Management violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., by failing to compensate her for overtime hours.[1] JAB Management moves for summary judgment on all claims. (D. 21). For the reasons stated below, JAB Management's motion is GRANTED.

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

---

[1] The Amended Complaint alleges JAB Management violated the FLSA by both failing to pay Osborn proper overtime compensation for hours worked more than forty hours per week, and for unlawfully docking her pay when she worked less than forty hours per week. (D. 14, ¶¶ 37, 40). In Osborn's Amended Response, she makes clear that she is not pursuing a claim that JAB Management unlawfully docked her pay. (*See* D. 28, ¶ 47). Accordingly, this claim is waived. *See Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996).

1

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a properly supported motion for summary judgment is made, the adverse party "may not rest upon mere allegations…, but…must set forth specific facts showing that there is a genuine issue for trial." *Id.* "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* at 252.

"In deciding motions for summary judgment, courts must consider the evidence as a whole," *de Lima Silva v. Dep't of Corrs.*, 917 F.3d 546, 559 (7th Cir. 2019), and "view[ ] the record and all reasonable inferences to be drawn from it in the light most favorable to the nonmoving party." *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018) (internal citation omitted). The court, however, will not draw inferences that are "supported by only speculation or conjecture," *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008), and "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003). A party who bears the burden of proof on a particular issue must affirmatively demonstrate, with specific allegations supported by appropriate citations to relevant admissible evidence, that a genuine issue of material fact exists. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923–24 (7th Cir. 1994).

## II.    BACKGROUND

As a preliminary matter, the Court addresses JAB Management's argument that Osborn's Amended Response again fails to comply with Local Rule 7.1(D). (D. 21, pp. 1–2). Osborn's initial Response was stricken by the Court after finding it failed to comply with Federal Rule of Civil Procedure 56(e) and Local Rule 7.1(D)(2). *See Text Order* on 05/22/2023. As a one-time courtesy, the Court allowed Osborn to amend her response to comply with these rules. After careful review,

the Court agrees that the Amended Response does not respond to JAB Management's Statement of Undisputed Material Facts as required by Local Rule 7.1(D)(2)(b).

### A. Local Rule 7.1(D)

Local Rule 7.1(D) opens with a warning that all summary judgment filings, including responses, must comply with its requirements and that "filings not in compliance may be stricken by the court." The Seventh Circuit has repeatedly upheld the district courts strictly enforcing its local rules, including "by accepting the movant's version of facts as undisputed if the non-movant failed to respond in the form required." *See Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014); *see also Hinterberger v. City of Indianapolis*, 966 F.3d 523, 528 (7th Cir. 2020); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019); *Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016); *see also Waldridge*, 24 F.3d at 924.

JAB Management's Statement of Undisputed Material Facts lists in numbered paragraphs seventy-eight alleged undisputed material facts. (D. 21, ¶¶ 1–78). Local Rule 7.1(D)(2)(b)(1)–(4) provides specific instructions for responding to these alleged undisputed material facts. This includes dividing the movants undisputed material facts into four subsections, and then under each subsection "*list[ing] by number each fact from Section B of the motion for summary judgment*." *See* CDIL-L.R. 7.1(D)(2)(b)(1)–(4)(emphasis added). While the Amended Response now includes Rule 7.1(D)(2)(b)'s identified subsections, Osborn fails to **list by number each fact from Section B of the motion for summary judgment**. *See id.* (an instructed repeated in each of the four subjections) (emphasis added). Instead, Osborn creates her own numbered list of fifty-one facts (number consecutively 1–51 throughout), which include incomplete and selectively rephrased recitations of *some* of JAB Management's seventy-eight undisputed material facts. (*See* D. 28 at ¶¶ 1–51). In addition to the Court not knowing which of JAB Management's numbered facts

3

Osborn is referring to, at least in part, there are also numerous facts to which Osborn provides no response at all. *Id.*

Employment discrimination cases are "extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Greere v. Bd. of Educ. of City of Chi., Ill.*, 267 F.3d 723, 727 (7th Cir. 2001); *see also United States v. Daniels*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judge are not like pigs, hunting for truffles buried in briefs."). As this was Osborn's second opportunity to respond, without penalty and with instructions that any amended response must comply with the rules governing summary judgment, her compliance was not only expected, but required. Accordingly, Osborn's Amended Response to JAB Management's Undisputed Material Facts is stricken. (D. 28 at ¶¶ 1–51). Because the Court reviews the record in the light most favorable to Osborn, it will consider Osborn's "Additional Material Facts" to the extent they are relevant, material to the controlling law, and supported by citations to admissible evidence in the record. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

### B. Factual Background

Advanced Correctional Healthcare, Inc., ("ACH") hired Osborn in April 2009 as an Administrative Assistant. (D. 21-1, p. 4). ACH contracts with municipalities throughout the United States to provide medical care at jail facilities. *Id.* JAB Management is a wholly owned subsidiary of ACH that hires and/or employs personnel necessary to service the contracted municipalities. *Id.* Internally, JAB Management hires and employs staff who implement and support the work being provided by ACH. *Id.* at pp. 1–2. Externally, JAB Management hires employees for ACH's other separate wholly owned subsidiaries, such as Advanced Inmate Medical Management ("AIMM"),

4

which manages the electronic medical records ("EMR") system used at the jails to document the medical care provided. *Id.* at p. 1.

In September 2012, Osborn was promoted to EMR Coordinator at AIMM; in October 2013, she was again promoted to SharePoint Administrator; and in November 2016 she was further promoted to Technical Support Specialist. (D. 21-11, p.19);[2] (D. 28-1, ¶ 4). With each promotion Osborn's duties became more technical and she was able to work with greater independence. When Osborn became the EMR Coordinator, one of her responsibilities was providing 24/7 on-call support for the AIMM help desk. This continued, along with other responsibilities, into her position as Technical Support Specialist. Between February 23, 2019, and August 2, 2021—the relevant statutory period—Osborn remained in the position of Technical Support Specialist and was classified as a "Salary/Exempt" employee. As such, she not permitted to enter any time worked outside of weekday hours between 8:00 a.m. – 5:00 p.m. into JAB Management's timekeeping system. (D. 21-5, p. 4).

Osborn did not document or otherwise keep record of any overtime hours she worked. There is, however, evidence that Osborn was allowed (and received) paid time off ("PTO") work each year and that she did not work more than forty hours a week when she took PTO. (D. 21-5, p. 7). *Id.* According to JAB Management's records in 2019, Osborn took 120 hours of PTO, 30 hours of paid sick time, and 64 hours of paid holiday time, for a total of 214 hours of paid time off work. (D. 21-12, ¶ 7). In 2020, Osborn took 128 hours of PTO, 12 hours of paid sick time, 24 hours of bereavement leave, and 76 hours of holiday pay, for a total of 240 hours of paid time off

---

[2] According to Defendant's Quarterly Coaching Form, its employment records show Osborn was hired in 2009 as an hourly administrative assistant. In 2012, she was promoted to EMR Coordinator, a salaried position of $45,000.00 annually. In 2013, she was promoted to SharePoint Administrator, at an annual salary of $50,000.00. In 2016 she was promoted to AIMM Technical Support Assistant and then the following week to Technical Support Specialist at an annual salary of $61,000.00.

5

work. *Id.* at ¶ 8. In the seven months prior to Osborn's termination in 2021, she used 64 hours of PTO, and 28 hours of holiday pay, for a total of 92 hours of paid time off work that year. *Id.* at ¶ 9.

Osborn's failure to track overtime hours was not simply a matter of her belief she was not permitted to earn overtime pay due to her designation as a "salary/exempt" employee. To the contrary, one of Osborn's job expectations was to track and report on the work she was doing and keeping a time study. Osborn's failure to do so, in part, ultimately resulted in her termination. Jessica Young, ACH's President, discussed this requirement with Osborn during their Quarterly Coaching Meetings in 2020 and 2021. Specifically, Osborn's November 2020 report, states:

> Prior to our coaching Dr. Johnson expressed a concern that he has been reading the AIMM meeting minutes it appears [Osborn] is not submitting any updates or tracking any of the work she has done. This makes it look as though she is not doing any work. Dr. Johnson reminded [Osborn] that meetings need to reflect work that is being done moving forward. Additionally, he shared a concern she had not completed her CAMPs form in anticipation of the meeting today.

*Id.* at p. 156. Osborn was instructed to "track and report on the work she is doing in the AIMM meeting minutes" going forward. *Id.* Young and Osborn also discussed the importance of Osborn effectively communicating the work she was doing to her employer, due to the evolution of her position over her last few years of employment. These changes included Osborn accepting an Offer of Remote Work in 2019. Then in early 2020, several of Osborn's coworkers resigned, including Allen Karnes, Daler Sayfiddinov, and her supervisor, Carrie Reindollar. (D. 21-17, p. 15); (D. 21-6, p. 4). Due to these changes, JAB Management believed Osborn had more freedom to design her own schedule and had less interaction with Osborn regarding the work she was doing from home. As a result, they relied on Osborn to effectively communicate to them what work she was doing.

Additionally, following Karnes, Sayfiddinov, and Reindollar's resignations, extra work fell on Osborn. This included Osborn being the only person taking back-up AIMM calls. (D. 21-16, p.

6

119). In April 2020, however, an error marking function was implemented in the EMR system resolved the number one issue Osborn received calls about, and consequently significantly reducing the number of calls received. (D. 21-6, p. 5); (D. 21-16, p. 121).

Throughout 2020, Young also worked with Osborn to reassign portions of her workload tasks-by-task to others and gave her action items to complete after their coaching meetings to further distribute tasks, such as reaching out to the new IT consultants for backup and assistance. (*See* D. 21-16). Despite having numerous tasks reallocated or adjusted, Osborn still had complaints at the November 2020 coaching meeting with Young regarding her workload. Osborn specifically, highlighted employee resignations from earlier that year and having to take on their workload. Osborn, however, eventually agreed that her co-worker, Jamie Nutz, who she had been training on EMR, and that a third-party IT company were now handling these jobs. *Id.* Thus, Young was not aware of any remaining tasks Osborn had absorbed but encouraged her to communicate with management to ensure all tasks were being properly assigned. *Id.*  Young told Osborn that she needed to come to her quarterly coaching meetings with all forms and action items completed and asked her to submit an updated job description to accurately reflect the work she was now doing. At that time, Young also noted that a large amount of Osborn's assigned action items were being removed, left incomplete, or continued. *Id.* at p. 161.

Because Osborn chose to use her personal cell phone to take helpdesk calls, rather than JAB Management's phone system that would have tracked her work-related calls, in 2021 JAB Management asked Osborn to provide information regarding the amount of time she was spending on calls. Osborn did not produce her phone records but submitted she had approximately nine hours of inbound calls and eight hours of outbound calls in an email to the VP of Human Resources

7

on February 24, 2021. (D. 21-17, p. 11).The time period those calls covered was not specific in Osborn's email. *See id* .

On March 3, 2021, Osborn met with Young and JAB Management's Director of Human Resources, Sue Webster. *Id.* at p. 14. At that meeting Osborn again made complaints that she was doing jobs that were not part of her job title, and she was instructed to send Webster a list of those tasks, and how many calls she was taking after hours. *See id.* On March 16, 2021, Webster e-mailed Osborn following up on these action items. *Id.* at pp. 13–14. Osborn responded to Webster, stating:

> …I'm not sure how to tell you exactly how many calls I take after hours. I don't always do the ticket at midnight or 5:00 AM. I enter the ticket, but not immediately. Sometimes I don't get any calls/emails. Sometimes I get 3 or 4. As I stated in our conversation, it's not the calls/emails I get that aren't part of my current job description. The calls I get after hours have diminished over the years as we perfect the EMR.

*Id.* at p. 13.

Issues with Osborn effectively communicating not only her job duties, but also the amount and extent she was working persisted into 2021. JAB Management's Separation of Employment Form set forth the following reasons for Osborn's termination:

> On February 17, 2021, Ms. Osborn was coached by her supervisor regarding her lack of documentation and communication. Ms. Osborn has been unable to effectively communicate her workload and job responsibilities. Tasks were reassigned to other co-workers due to not being able to complete her workload and not wanting to do the tasks. After some tasks were reassigned, Ms. Osborn continued to voice difficulties completing her tasks. Ms. Osborn's supervisor has received complaints from co-workers regarding Ms. Osborn's lack of professionalism when having to work on projects with her. There has not been much improvement since Ms. Osborn's original coaching and as a result Ms. Osborn's supervisor has lost faith in her ability to perform her technical support specialist position effectively.

(D. 21-14, p. 13). ACH's President further testified that Osborn was terminated because:

> [She] was unable to explain to us what she was doing. She complained she had too much work. And task by task, we helped her by removing things from her plate. That did not seem to alleviate her complaints that she had too much work; but she wasn't getting the work done that we asked her to do. And she couldn't explain what it was she was doing. In addition, she did not work well with her co-workers. We had many complaints about her attitude.

*Id.* at p. 12.

Following her termination, Osborn erased the hard drive of her company-issued computer, without being asked to do so, before returning it to JAB Management. At the time her termination, Osborn was fifty-nine years old. Three weeks later, on August 23, 2021, a twenty-five-year-old Technical Support Specialist assumed Osborn's job duties.

### C. Procedural Background

On February 15, 2022, Osborn filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on age.[3] A week later, on February 23, 2022, Osborn filed a Complaint in this Court alleging violations of the FLSA and IHRA. (D. 1). The EEOC issued a notice of right-to-sue letter on June 28, 2022, and on July 14, 2022, Osborn filed an Amended Complaint which added an ADEA claim. (D. 14). Discovery closed in this case on February 23, 2023. (D. 12); *Text Order* on 05/23/2022. At that time, Osborn had failed to specify any computation for damages in either her Rule 26 Initial Disclosures or her subsequent responses to written discovery. (D. 21-19, ¶ 3); (D. 21-15, p. 9). Now before the Court is JAB Management's Motion for Summary Judgment and Memorandum in Support. (D. 21). It has been fully briefed, and this Order follows.

**DISCUSSION**

---

[3] The Court has not been provided with a copy of Plaintiff's EEOC Charge of Discrimination or the EEOC's Notice of Right to Sue. However, in Defendant's Answer to Plaintiff's Amended Complaint, Defendant admits that "on or around February 15, 2022, the Plaintiff filed a Charge of Discrimination with the EEOC alleging age discrimination, and that Plaintiff received a Notice of Right to Sue from the EEOC on or around June 28, 2022. (D. 15, ¶¶ 28–29, 61–62).

9

### A. FLSA

JAB Management asserts in its motion for summary judgment that it is their position that Osborn was properly classified as exempt from the overtime requirements of the FLSA pursuant to the "computer employee exception" found at 29 U.S.C. §§ 213(a)(17) and 541.400. (D. 21, p. 16, fn. 2). However, for purposes of summary judgment, JAB Management assumes *arguendo* that Osborn's job as a Technical Support Specialist was "non-exempt" from the overtime requirements of 29 U.S.C. § 207. *Id.* Therefore, the Court will as well. Osborn also argues that JAB Management's actions constituted willful violations of the FLSA, extending the statute of limitations from two to three years after the cause action accrued. (D. 14, ¶ 15). JAB Management denies this allegation, but for purposes of their motion for summary judgment, analyzed Osborn's claims over the three-year period prior to her filing her original complaint on February 23, 2022. (D. 21, p. 17); *see also* 29 U.S.C. § 255. Therefore, the Court will treat the relevant employment period at issue as being from February 23, 2019, through August 2, 2021.

#### 1. Burden of Proving Overtime Hours

"FLSA provides that 'no employer shall employ any of his employees…for a workweek longer than forty hours unless' it pays the employees overtime pay." *Melton v. Tippecanoe Cty.*, 838 F.3d 814, 818 (7th Cir. 2016) (quoting 29 U.S.C. § 207(a)). "[A]n employee who brings suit pursuant to FLSA 'has the burden of proving that he performed work for which he was not properly compensated.'" *Id.* at 818 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded on other grounds by* Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251–62). "Where the employee alleges that his employer kept inaccurate time records, [s]he 'has carried out h[er] burden if [s]he proves that [s]he has in fact performed worked for which [s]he was improperly compensated and if [s]he produces sufficient evidence to show the amount and extent of that work

10

as a matter of just and reasonable inference.'" *Id.*; *see also Brown v. Family Dollar Stores of Ind., LP*, 534 F.3d 593, 595 (7th Cir. 2008). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* "If the employer fails to meet the burden, a court may award damages even though they are approximations." *Brown*, 534 F.3d at 595.

Here, JAB Management's time keeping system did not provide an accurate representation of the time Osborn spent performing compensable work. Thus, Osborn must prove the amount and extent of her work as a matter of just and reasonable inference. *See Anderson*, 328 U.S. at 687. "Unreported work time can be 'reconstructed from memory, inferred from the particulars of the job[]…, or estimated in other ways – any method that enables the trier of fact to draw a 'just and reasonable inference' concerning the amount of time the employee had worked would suffice.'" *Webster v. Metalcraft of Maryville, Inc.*, 2021 WL 5964523 (E.D. WI Dec. 16, 2021) (quoting *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2012)). While this is a lenient standard, an employee's own vague, inconsistent, or speculative testimony is insufficient to establish a "just and reasonable" inference as to how many overtime hours they worked. *See id.* Employees can only recover wages for hours they can prove they worked. *See Weil v. Metal Techs, Inc.*, 925 F.3d 352, 358, n.5 (7th Cir. 2019).

Osborn testified that over the course of her employment she worked on average 55 hours a week, stating: "I figured I work at least ten hours a day, and on the weekends, [so] it was pretty easy to come up with that, a norm." (D. 21-6, p. 1); (D. 21-5, p. 7); (D. 21-15, pp. 4-5). When about asked what she worked on for ten hours each day she answered generally, "[c]ustomer issues, the database, the reports, it was very labor intensive." (D. 21-6, p. 3). And when asked what she

11

spent ten hours a day working on before her more recent work on the database she said, "different tests, and different ways to make the data full, and just all kinds of things." *Id.* On the weekends, Osborn testified that she worked anywhere from a few hours to all day and spent a minimum of three hours each month patching the servers, which was always done outside of business hours. (D. 21-6, p. 3); (D. 28-1, ¶ 11). Osborn also pointed to e-mails that were sent outside of "business hours" to show she worked overtime and identified the following individuals as being aware of her overtime work: Allen Karnes, Jamie Nutz, Carrie Reindollar, and Daler Sayfiddinov. (D. 21-15).

In support of their summary judgment motion, JAB Management relies heavily on the decisions in *Melton v. Tippecanoe Cty*, 838 F.3d 814 (7th Cir. 2016), *Brown v. DS Serv. of Am., Inc.*, 246 F.Supp.3d 1206 (N.D. Ill. 2017), and *Holaway v. Stratasys Inc.*, 771 F.3d 1057 (8th Cir. 2014). Each of these cases demonstrate that a plaintiff's recollection of unpaid time does not lead to a just and reasonable inference of an FLSA violation when the recollection is speculatory or directly contradicted by undisputed records. For example, in *Melton*, the Seventh Circuit rejected a plaintiff's unsupported claims that he worked through lunch when company records showed he was compensated for time worked during that time. 838 F.3d at 817, 819–20. Similarly, the courts in *Brown* and *Holaway* held that a plaintiff's broad estimations of hours did not support a just and reasonable inference that they were entitled to overtime pay when the estimations were based on speculatory recollections, were not supported with sound foundational testimony, did not account for paid time off, and were checked against company records. *See Brown*, 246 F. Supp. 3d at 1221 (holding that plaintiff's reliance on memory to estimate the hours she worked each week, the number of hours she spent working during lunch, and hours spent staying late in office was speculatory and did not support inference of FMLA violation); *Holaway*, 771 F.3d at 1058–60

(reasoning that failure to provide evidence of specific weeks, days, and hours plaintiff worked overtime, failure to take into account vacations and holidays, and failure to check estimations against business records was not "sufficient evidence to show the amount and extent of [overtime] work") (internal citations omitted).

Here, the Court similarly finds Osborn has failed to prove the amount and extent of her work, let alone work in excess of forty hours a week, as a matter of just and reasonable inference. First, the Court finds Osborn's testimony that she worked on average 55 hours a week over the course of employment to be unreliable and directly contracted by the record. It is undisputed that Osborn took over 200 hours of paid time off work in 2019 and 2020, and almost 100 hours of paid time off work in 2021. Plaintiff testified that she did not work over forty hours a week during her PTO; however, like the plaintiff in *Holaway*, she fails to include these PTO periods in her estimations that she worked an average of 55 hours each week during her employment. *Holaway*, 771 F.3d at 1060 (noting plaintiff's overtime calculations "failed to take into account any paid holidays" or "any paid vacations").

Additionally, it is undisputed that the number of help-desk calls Osborn received was, by her own admission, "tremendously reduced" in April 2020. It further undisputed that many tasks previously assigned to Osborn were reassigned to other employees in 2020 and 2021—notably absent from the record, however, is evidence of Osborn being assigned new tasks during that time. Despite these changes, Osborn's testimony that she worked on average 55 hours a week over the course of her employment did not change. There is no evidence, however, regarding the amount and extent of the work Osborn was doing during any specific time.

Osborn supplementals her testimony with emails she sent outside of "business hours." The question, however, it not whether she worked outside of business hours, but whether the number

13

of hours she worked on a given week exceeded forty hours. These emails, without more, do not establish the amount and extent of Osborn's work, both in responding to the email and whether that put her over the forty-hour threshold. Had Osborn also provided reliable evidence of the work she performed in order to respond to the e-mail, along with evidence of the work she had already completed that week, these e-mails could have aided the Court in estimating the extent of any unpaid overtime work done during that week. Even if it was not the exact amount, that would have been sufficient to meet the just and reasonable inference standard. *See Webster*, 2021 WL 5964523 at *4 ("But while employees' calculations need not hit the bullseye, they must at least land somewhere on the proverbial dart board.").

Similarly, had Osborn provided sworn testimony from her co-workers regarding the amount and extent of her work, rather than simply identifying them, this could have been evidence considered by the Court. Without this testimony, however, the Court can only speculate as to whether they support Osborn's claim. Furthermore, three of those individuals—Karnes, Sayfiddinov, and Reindollar—ceased working with Osborn in early 2020, and therefore, would not have personal knowledge regarding the amount and extent of Osborn's work for most of 2020 or any of 2021.

Accordingly, the Court finds that Osborn cannot prove by a just and reasonable inference the amount and extent of work she performed during the relevant time period, and therefore, JAB Management's Motion for Summary Judgment as to Count I of the Amended Complaint is GRANTED.

### B. Age Discrimination

The ADEA and IHRA make it unlawful for an employer to take adverse employment action against an individual because of their age. 28 U.S.C. § 623(a)(1); 775 ILCS 5/2-102. The ADEA

14

protects workers who are forty years of age or older from age-based employment discrimination. *See* 29 U.S.C. § 631(a). The Court uses the same analytical framework for claims under the ADEA and IHRA. *See Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 659 (7th Cir. 2013) (citing *Zaderaka v. Ill. Human Rights Comm'n*, 131 Ill.3d 172 (1989)). To substantiate a claim under the ADEA, a plaintiff must identify facts in evidence that her age was the "but-for" cause of her termination. *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). In other words, Osborn must demonstrate that, but-for her age, the termination would not have occurred. *See id.*

At summary judgment, the primary question is whether the evidence, when considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (assessing evidence in an ADEA claim "as a whole, rather than asking whether any particular piece of evidence proves the case by itself"). Under the traditional *McDonnell Douglas* burden-shifting approach, which both parties used here, once the plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reasons for the challenged action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). If the employer does so, the burden shifts back to the plaintiff to show that the proffered reason was a pretext for age discrimination. *Id.*

In order to establish a prima facie case of age discrimination, a plaintiff must show: (1) she is a member of a protected class (*i.e.*, over forty years of age); (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) the employer treated younger, similarly-situated employees more favorably, or replaced her with someone substantially younger. *Miller v. Borden, Inc.*, 168 F.3d 308, 313 (7th Cir. 1999) ("In situations involving the

simple termination of a single employee, normally the employee must establish that the employer *sought a younger replacement* for him.") (emphasis in original). For the prong concerning the employer's legitimate job expectations, the prima facie case and pretext inquires often overlap. Therefore, a court may "skip the analysis of plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." *Benuzzi v. Bd. of Edu. of Cty of Chi.*, 647 F.3d 652, 663 (7th Cir. 2011).

Here, JAB Management offers nondiscriminatory explanations for Osborn's termination; specifically, Osborn's poor communication regarding her workload and job responsibilities, failure to complete assigned tasks, and complaints from her co-workers about her attitude. Jessica Young testified that Osborn was terminated because she "was unable to explain to [JAB Management] what she was doing." (D. 21-14, p. 12). At the same time Osborn failed to communicate what she was currently working on to her employer, she simultaneously continued to complain that she had too much work to complete. *Id.* Despite JAB Management removing work from her plate "task by task," and not adding any new work, Osborn continued to complain that she had too much work without providing evidence to her employer that she was completing already assigned tasks. *Id.* The reassignment of tasks from Osborn to other employees, and warnings JAB Management gave Osborn about needing to effectively communicate her workload was documented in the 2020 and 2021 Quarterly Coaching Meeting reports between Osborn and Young. JAB Management also claims that they received complaints about Osborn's attitude from her co-workers. *Id.*

Osborn argues that these nondiscriminatory reasons are pretextual. First, Osborn argues that JAB Management's assertion that she was terminated due to her inability to complete assigned tasks has no merit, because due to several employees resigning and an "apparent hiring freeze from February 28, 2020, until August 2, 2021," Osborn had to absorb the job duties of several

16

employees. (D. 28, p. 29). Therefore, JAB Management had set her up to fail. *Id.* at pp. 29–30. Next, Osborn argues JAB Management's allegations regarding her "poor communication" and complaints from co-workers are meritless. *Id.* at p. 30. In support, she cites to the fact that she had been promoted four times over the course of her employment and received numerous reviews praising her professionalism and ability to effectively communicate. *Id.* Osborn also highlights that she received no formal discipline or reprimands throughout her twelve years of employment. *Id.* Lastly, to show pretext, Osborn argues that Young's judgment about her performance is "unworthy of credence," because she never supervised her. *Id.*

To establish pretext, a plaintiff must show that (1) the proffered nondiscriminatory rationale for termination was dishonest; and (2) the employer's true reason was rooted in prohibited discriminatory intent. *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 842 (N.D. Ill. 2017). The primary question is whether the employer honestly believed the reason it offered to explain the discharge, not whether the employer's stated reason was inaccurate or unfair. *Id.* A court's concern is not that an employer has been wrong about the employee's performance or too hard on the employee, rather to be pretextual, the nondiscriminatory reason must be a lie. *Id.*; *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). Pretext can be demonstrated by identifying weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reason so that a reasonable person could find the reason unworthy of credence. *Coleman*, 667 F.3d at 852–53.

As discussed above, JAB Management has offered several reasons related to Osborn's job performance that led to her termination. As such, the burden shifts back to Osborn to demonstrate pretext. The pretext identified by Osborn is both unpersuasive and contradicted by the evidence in the record. First, the record contradicts Osborn claim that she absorbed the job duties of several

17

employees from February 28, 2020, until her termination on August 2, 2021. Rather it appears all those tasks were reassigned to others, and that Young made continuous efforts to further reduce Osborn's workload. Further, Osborn had not received a promotion since 2016. Although she discussed wanting a promotion or raise with Young during their meetings in 2020 and 2021. When Osborn initially brought up being promoted in April 2020, Young explained that they deadline for applying had passed and that they had wanted a nurse to fill the position Osborn was interested. Young did discuss with Osborn steps she could take to achieve this goal in the future. such as updating her job description to accurately reflect her present job duties, effectively communicating the work she was doing, and ways to increase her internal ratings like giving recognition certificates to other employees. (D. 21-16, p. 122).

Additionally, while the Court recognizes that Osborn's received numerous recognition remarks from her co-workers over the course of her employment. However, the recognition remarks are not dated, and many were from individuals who resigned from the company in early 2020, over a year and half before Osborn was terminated. Finally, Osborn must demonstrate that the true reason for her termination was rooted in discriminatory intent. Osborn has not referenced any evidence that her age was the reason for her termination, or that younger employees were treated more favorably. The fact Osborn's job duties were assigned to a substantially younger person following her termination alone does not show her age was the "but-for" cause of her termination. Rather, the Court finds that Osborn has failed to proffer sufficient evidence that permit a reasonable factfinder to conclude that she was meeting JAB Management's legitimate expectations at the time of her termination, and she failed to refute JAB Management's evidence to the contrary. Accordingly, JAB Management's summary judgment motion on Osborn's age discrimination claims under the ADEA and IHRA *via* termination are GRANTED.

**CONCLUSION**

For the reasons stated above, Defendant JAB MANAGEMENT SERVICES, INC.'s [21] Motion for Summary Judgment is GANTED. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff. The Clerk is DIRECTED to close this case.

ENTERED this 11th day of March, 2024.


/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge